UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CAMILLE D. ORMSBY, | ) |
| | ) |
|    Plaintiff | ) |
| | ) |
| v. | )    No. 1:13-CV-86-GZS |
| | ) |
| SOCIAL SECURITY ADMINISTRATION COMMISSIONER, | ) ) |
| | ) |
|    Defendant | ) |

## REPORT AND RECOMMENDED DECISION

The Social Security Administration found that Camille D. Ormsby has severe impairments but retains the functional capacity to perform substantial gainful activity, resulting in a denial of Ormsby's application for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act. Ormsby commenced this civil action to obtain judicial review. I recommend that the Court affirm the administrative decision.

### THE ADMINISTRATIVE FINDINGS

The Commissioner's final decision is the November 7, 2011, decision of the Administrative Law Judge because the Appeals Council "found no reason" to review the decision. The ALJ's decision tracks the familiar five-step sequential evaluation process for analyzing social security disability claims, 20 C.F.R. §§ 404.1520, 416.920. (ECF No. 8-2, PageID ## 23, 34-43.)

At step 1 of the sequential evaluation process, the ALJ found that Ormsby met the insured status requirements of Title II through March 31, 2008, and has not engaged in substantial gainful activity since April 30, 2005, the date of alleged onset of disability. At step 2, the ALJ found the following severe impairments: bipolar disorder, post-traumatic stress

disorder, and chronic right hip pain. At step 3, the ALJ found that this combination of impairments would not meet or equal any listing in the Commissioner's Listing of Impairments, Appendix 1 to 20 C.F.R. Part 404, Subpart P. The ALJ found no restrictions in activities of daily living, moderate restrictions in social functioning, and moderate restrictions in regard to concentration, persistence, and pace. Ormsby does not dispute the ALJ's findings at steps 1 through 3.

Prior to further evaluation at steps 4 and 5, the ALJ assessed Ormsby's residual functional capacity. The ALJ found that despite her combined impairments, Ormsby retains the residual functional capacity to perform light work involving simple, routine, repetitive tasks in a non-production-paced environment, so long as that work requires only simple work-related decisions and few, if any, workplace changes. Finally, the ALJ found that Ormsby can have only occasional interaction with co-workers and the public. At step 4, the Judge found that this degree of limitation precluded past relevant work, some of which was semi-skilled and some of which involved public interaction.

Ormsby was born in 1970, has some college education and can communicate in English. Transferability of job skills was not a factor in the ALJ's decision. The ALJ presented a vocational expert with Ormsby's vocational profile and the residual functional capacity findings and found, based on the vocational expert's hearing testimony, that Ormsby could still engage in other substantial gainful employment, resulting in a finding that she does not qualify as disabled.

### DISCUSSION OF PLAINTIFF'S STATEMENT OF ERRORS

Ormsby's challenge to the ALJ's decision is focused on the ALJ's residual functional capacity findings related to her mental health symptoms. Ormsby does not otherwise challenge the step 5 finding concerning other work, except insofar as it depends on the ALJ's residual

functional capacity finding.  (Statement of Errors, ECF No. 14.)  Ormsby's challenges assign error to (1) the way in which the ALJ handled or characterized evidence concerning claimant's miscellaneous Global Assessment of Functioning (GAF) scores; (2) the ALJ's findings related to claimant's mood lability; (3) the ALJ's findings about the significance of claimant's college and related work study experience; and (4) the ALJ's credibility evaluation.

### A.  Standard of Review

The Court must affirm the administrative decision so long as it applies the correct legal standards and is supported by substantial evidence.  This is so even if the record contains evidence capable of supporting an alternative outcome.  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam); Rodriguez Pagan v. Sec'y of HHS, 819 F.2d 1, 3 (1st Cir. 1987).  Substantial evidence is evidence that a reasonable mind might accept as adequate to support a finding.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981).  "The ALJ's findings of fact are conclusive when supported by substantial evidence, but they are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

### B.  Discussion

*1.  The ALJ's selective use of GAF scores*

Ormsby complains that the ALJ made improper use of or inaccurate references to the GAF scores in her medical records.  What the ALJ wrote was that a GAF score of 41 to 50 is classified as severe by the American Psychiatric Association in its Diagnostic and Statistics Manual, but that a GAF score in that range, standing alone, does not necessarily mean that an

3

individual is disabled. (ALJ Hr'g Dec. at 6-7, ECF No. 8-2.[1]) The ALJ was unwilling to treat the GAF scores reported by mental health treatment providers as dispositive of disability, especially, the ALJ reasoned, because Ormsby's GAF score rose to 65 in late 2005. (Id. at 7.)

Ormsby complains that by focusing on a rise in her GAF score not long after (within a year of) the alleged disability onset date the ALJ was looking at the wrong period of time. She says the ALJ should have looked to see where the GAF scores went from there, because the period of alleged disability only began in April 2005. She contends that the relevant care provider within the alleged period of disability is Susan MacArthur, PMH-NP, of Community Health and Counseling Services and she acknowledges that NP MacArthur assigned a GAF score of 65 on November 4, 2005. She cites several reports of low GAF scores subsequent to December 2005, including in March 2007, July 2007, and March 2009. (Statement of Errors at 3-4, citing Admin. R. at 427, 433, 444, 452.) She asserts: "Contrary to the ALJ's suggestion, the . . . GAF score decreased after her alleged onset date." (Id. at 4.)

All of the record pages Ormsby cites in support of her GAF argument disclose statements that MacArthur made on client certification forms submitted to the Department of Behavioral and Developmental Services, not entries in Ormsby's personal consultation, treatment, or progress notes. This fact does not mean that the GAF scores have no weight, but Ormsby has not demonstrated that her longitudinal GAF scores make the ALJ's reference to a score of 65 in 2005 erroneous. More meaningful in this record, as in most, is an analysis of the care provider notes. Ormsby's second statement of error turns to that question.

## 2.    *The ALJ's finding of mood stability*

There is a regulatory requirement that applicants for or recipients of disability benefits follow prescribed treatment if treatment will restore the ability to work. 20 C.F.R. §§ 404.1530,

---

[1]    The ALJ's decision begins on PageID # 34 of the electronic docket.

416.930. Ormsby attempts to undermine the ALJ's finding that her mental health records reflect longitudinal mood stability when she is treated with prescribed psychoactive medication. Ormsby relies on selections in the CHCS files (Exhibit 5F) in support of her contrary assertion. Based on my own review of the CHCS/MacArthur treatment and progress notes, I cannot say that the records are incapable of supporting the ALJ's finding that Ormsby has a medically-manageable mental impairment. Following a November 2005 consultation, for example, MacArthur described Ormsby as someone "who came late to stabilization of mood and became quite stable in her life and goals once stabilized on medication." (PageID # 488.) MacArthur's notes tend to emphasize the need to manage medications and they report positively on Ormsby's mental status, including her good insight and judgment. MacArthur's progress notes throughout 2009, for example, certainly suggest that Ormsby's mental health symptoms can be controlled and stabilized with medication, including during the spring season when hypomanic influences are, according to Ormsby's representations, more intense. (PageID ## 495-524.) Medication management was a primary topic of visits to the CHCS after MacArthur's departure from the practice, as it was before. (*E.g.*, PageID # 493.) These record references are offered as bookend examples of what can be found in Exhibit 5F, with entries that provide substantial evidence in support of the ALJ's finding of relative mood stability when Ormsby takes prescribed medication. It must also be noted that all of the consulting experts who reviewed Ormsby's file for purposes of performing the Commissioner's psychiatric review technique opined that Ormsby does not have a "severe" mental impairment because her degree of limitation in the "B criteria" is "mild" across the board. (Exs. 7F, PageID ## 722, 724; Ex. 12F, PageID ## 840, 842; Ex. 14F, PageID ## 852-853.)

Ormsby highlights other entries to support a contrary inference. Specifically, she cites pages 583 (Nov. 2006), 572 (Apr. 2007), 559 (Aug. 2007), 554 (Nov. 2007), 527 (May 2008), 518 (July 2008), 510 (Sept. 2008), 502 (Oct. 2008), 497 (Nov. 2008), 474 (July 2009) of the Administrative Record. Nevertheless, a longitudinal review of the CHCS records yields substantial evidence in support of the ALJ's finding, though it is possible that a reasonable person could draw contrary inferences. Ormsby's symptoms were not as well-controlled in November 2006 when she had a negative reaction with one prescribed drug and went through an "ongoing hypomanic episode perhaps mixed." (PageID ## 618-620.) In December 2006, however, MacArthur begins to make more positive entries concerning the stabilization of Ormsby's condition with medication. (PageID # 612.) In February 2007, continued modification of medication was reported and MacArthur noted as her assessment "mood stability with no problematic side effect issues in treatment of bipolar II and posttraumatic stress disorder." (PageID # 610.)

To be sure, there were still issues, including irritability in February through April of 2007 (PageID # 604), but the record suggests low points that coincide with acute situational stressors such as experiencing relationship issues, resolving a preexisting substance abuse issue in the 2007 timeframe (PageID # 589-599),[2] and a car accident near the beginning of 2009 (PageID ## 424-425), while otherwise depicting what could reasonably be regarded as a managed condition with occasional periods of feeling a little "manicky" or "racy" or "depressed" or "irritable" (sometimes in relation to seasonal change) and with some situational stress related to parenting several children, attempting to succeed in college courses, and searching for a new home

---

[2] There is also an indication of fear associated with driving or riding in a car (PageID # 532), though one of Ormsby's prior occupations was truck driving. The nature of this fear appears to be that Ormsby drives in a risky fashion when she is in a manic episode. (PageID # 60.) However, Ormsby operates a vehicle on a regular basis, including driving her children to school. (PageID # 62-63.)

6

(PageID ## 538, 541, 563, 574, 578, 582). A reasonable person might review these records and conclude that the ALJ made a reliable assessment that Ormsby's degree of limitation is not more severe than what the ALJ found, particularly when the consulting medical experts reviewed the same records and concluded that Ormsby's records did not establish the existence of severe limitation.

### 3. *College and work study evidence*

At step 3 of the sequential evaluation process the ALJ found that Ormsby has moderate limitations when it comes to concentration, persistence, and pace, which departed from the consulting experts' views that there was only mild limitation in this area. The ALJ based this assessment, in part, on the difficulties Ormsby experienced pursuing a college education. The ALJ noted that Ormsby's performance in her coursework fell off over time due to a decreased ability to pay attention, focus, and complete tasks. (ALJ Hr'g Dec. at 5, PageID # 38.)

Ormsby says it was inconsistent for the ALJ to identify moderate limitations for purposes of step 3 but to then reason, at step 4, that Ormsby's college and work study experience demonstrated that she could maintain employment in an unskilled occupation. (Statement of Errors at 8.) The ALJ cited Ormsby's ability to maintain decent grades in 2006 and 2007 as some evidence supporting his conclusion that Ormsby has the capability to perform "some type of unskilled work." (ALJ Hr'g Dec. at 8, PageID # 41.) Ormsby says her college experience was not ultimately successful and that her transcripts show some failing grades, including in 2007, and several withdrawals. (Statement of Errors at 8.) She also asserts that she was unable to maintain part-time employment in a work study job on top of her coursework and home-based responsibilities. (Id. at 9; see also Tr. of Admin. Hr'g at 7, PageID # 57.) At the administrative hearing Ormsby relied in part on the "bipolar" nature of her academic performance to illustrate

7

why her bipolar disorder would preclude substantial gainful activity. (PageID ## 54-55.) Ormsby's argument now is simply that it was error for the ALJ to cite her academic experience as positive evidence of work capacity. (Statement of Errors at 9.) No reasonable person could view it that way, in her view. (Id.)

Ormsby's academic experience was one piece of evidence the ALJ relied on to conclude that Ormsby has the capacity for substantial gainful activity. Standing alone, the evidence may not be especially persuasive, as Ormsby contends. The ALJ's reliance on it as some indication of an ability to work was not, however, clearly erroneous. As the Commissioner notes, Ormsby reported that her failure to maintain work study employment related to difficulty around other people. (PageID ## 66-67.) The ALJ took this into consideration and made a residual functional capacity finding that accounted for Ormsby's report of social difficulties. The ALJ also relied on Ormsby's performance of relatively fulsome activities of daily living, the longitudinal records associated with the mental health treatment provided at CHCS, already discussed, and medical records from subsequent mental health treatment providers that also suggested a managed condition. Together, these sources of evidence supply substantial support for the ALJ's decision.

### 4. *Credibility*

Finally, Ormsby takes issue with the ALJ's reference to her work history from before her alleged onset date. (Statement of Errors at 9-11.) In fashioning his residual functional capacity finding, it is evident that the ALJ credited some of Ormsby's assertions about her limitations, but was unwilling to give her representations full credit on credibility grounds. After characterizing Ormsby's claims, the ALJ stated that Ormsby's impairments could reasonably be expected to cause the symptoms she alleged, but that her representations about the intensity, persistence, and limiting effects of her impairments were overstatements and were only credit-worthy to the

extent of his residual functional capacity finding. (PageID # 39.) From there the ALJ discussed multiple sources of evidence that caused him to discredit Ormsby's representations, finishing with one observation about Ormsby's work history from before her alleged onset date. According to the ALJ, that work history reflected only sporadic work activity, which the ALJ cited as some indication of an election not to engage in full-time work activity rather than an inability to do so. (PageID # 41.)

Ormsby asserts that it was error for the ALJ "to draw negative inferences concerning [her] credibility based solely on her work history" and that the ALJ's consideration of her work history to make a credibility determination was flatly prohibited by existing law in this district. (Statement of Errors at 10-11 (collecting cases)).

The ALJ did not rely exclusively on Ormsby's prior work history to conclude that her representations concerning her subjective symptoms overstated her degree of impairment. As previously indicated, the ALJ considered other evidence as well. As for whether a reference to past work history is strictly prohibited, the Secretary's regulations indicate that when symptoms cannot be verified by objective medical evidence, but the diagnosed medical impairments could reasonably be expected to cause the alleged symptoms, "the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record," indeed, "*must consider the entire case record*, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." Assessing the Credibility of an Individual's Statements, Social Security Ruling 96-7p (July 2, 1996) (emphasis added). Thus, "[i]t is not sufficient for the adjudicator to make a single, conclusory

9

statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" Id.

In Black v. Barnhart, No. 05-cv-000172-DBH, the court asserted that any reliance on prior work history is inappropriate because Social Security Ruling 96-7p, quoted above, does not "mention[] work history as an appropriate consideration in evaluating credibility." 2006 WL 1554645, at *5, 2006 U.S. Dist. Lexis 35853, at *18 (June 1, 2006). By my reading, SSR 96-7p does not specifically preclude consideration of prior work history to assess credibility. To the contrary, the ruling calls for consideration of the entire case record. Moreover, the Secretary's regulations specifically mention work history as a relevant factor when some aspects of the record are evaluated. For example: "We will consider all of the evidence presented, including information about your prior work record." 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). However, what I believe Black and similar decisions stand for is that it is not appropriate to treat failed work attempts as reliable evidence of a capacity for substantial gainful activity. That would be unreasonable because the Secretary's sequential evaluation process for evaluating disability claims treats the absence of contemporaneous, substantial gainful work activity as, in effect, the very first step in *proving* disability. Id. §§ 404.1520(a)(4)(i). To find that the mere fact that a claimant failed to sustain substantial gainful activity is proof of *non*-disabled status (e.g., based on an inference that the claimant is a "malingerer") would run counter to the grain of the sequential evaluation process. Indeed, the Commissioner's counsel agreed at oral argument that if the ALJ had relied exclusively on Ormsby's pre-onset work history for a credibility determination it would have been error.

As has often been noted, the ALJ's discretion is at its height when making credibility determinations. Rodriguez v. Celebrezze, 349 F.2d 494, 496 (1st Cir. 1965) ("Issues of

10

credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the [Commissioner].") The First Circuit Court of Appeals has elsewhere observed: "Where the facts permit diverse inferences, we will affirm the [Commissioner] even if we might have reached a different result." Shaw v. Sec'y of Health & Human Servs., No. 93-2173, 1994 WL 251000, *4, 1994 U.S. App. LEXIS 14287, *14-15 (1st Cir. 1994) (unpublished). Here, the ALJ reviewed what was available in the evidentiary record, not just the evidence concerning Ormsby's pre-onset work history, and the ALJ made a residual functional capacity finding that fairly weighed Ormsby's report of subjective symptoms against what the balance of the record suggested to the ALJ was more likely the case. Reasonable minds relying on this same evidentiary record might differ about the likely degree of Ormsby's mental impairment and the functional limitations that arise from it. But the ALJ articulated a residual functional capacity finding based on a reading of the evidence that reasonable minds might accept as adequate to support his finding, crediting Ormsby's allegations concerning her subjective symptoms to some extent, but not entirely, in the face of consulting expert advice that the medical records do not demonstrate a severe condition. Because a reasonable mind might accept the ALJ's use of the available record as adequate to support his residual functional capacity finding, I recommend that the Court affirm the decision.

## CONCLUSION

For the reasons set forth in the foregoing discussion, I RECOMMEND that the Court affirm the Commissioner's final decision and enter judgment in favor of the Commissioner.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to

28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

December 11, 2013  /s/ Margaret J. Kravchuk
U.S. Magistrate Judge